FILED
John E. Triplett, Acting Clerk
United States District Court

By mgarcia at 10:11 am, Sep 16, 2020

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ALEX DIGIACOMO, | **UNDER SEAL** |
| Plaintiff/Relator, | ***Qui tam* action filed *in camera* and under seal in accordance with 31 U.S.C. § 3730(b)(2)** |
| v. | |
| MATTHEW F. MCCARTY; GENOTOX LABORATORIES, LTD.; MATTHEW F. MCCARTY, MD PLLC d/b/a BALCONES PAIN CONSULTANTS; GENORITE PHARMACY, LLC; YOUR LABORATORY, L.P. d/b/a YOUR HEALTH LAB; ROBERT GARCIA; BEARDEN HEALTHCARE ASSOCIATES, INC.; SCREVEN COUNTY HOSPITAL, LLC d/b/a OPTIM MEDICAL CENTER-SCREVEN/OPTIM HEALTHCARE; NEW BEGINNINGS RECOVERY CENTER, INC.; CHICAGO PAIN MEDICINE CENTER S.C.; and JAMES R. DIESFELD, | **JURY TRIAL DEMANDED**  **Civil Action No.** _____2:20-cv-97_____ |
| Defendants. | |

**Butler Wooten & Peak LLP**
BY:   Robert H. Snyder, Jr.
         Joseph M. Colwell (*admission pending*)
*Counsel for Plaintiff/Relator*
2719 Buford Highway
Atlanta, GA 30324

(P) 706-322-1990
Rob@butlerwooten.com
Joseph@butlerwooten.com

## **SEALED COMPLAINT**

Plaintiff/Relator ALEX DIGIACOMO, by and through counsel of record,

Butler Wooten & Peak LLP, files this Sealed Complaint on behalf of the United

States of America against MATTHEW F. MCCARTY; GENOTOX

LABORATORIES, LTD.; MATTHEW F. MCCARTY, MD PLLC d/b/a

BALCONES PAIN CONSULTANTS; GENORITE PHARMACY, LLC; YOUR

LABORATORY, L.P. d/b/a YOUR HEALTH LAB; ROBERT GARCIA;

BEARDEN HEALTHCARE ASSOCIATES, INC.; SCREVEN COUNTY

HOSPITAL, LLC d/b/a OPTIM MEDICAL CENTER-SCREVEN/OPTIM

HEALTHCARE; NEW BEGINNINGS RECOVERY CENTER, INC.; CHICAGO

PAIN MEDICINE CENTER S.C.; and JAMES R. DIESFELD, Defendants.

1.

This is an action to recover all available damages and civil penalties on

behalf of the United States of America arising from false and/or fraudulent records,

statements, and claims made and/or caused to be made by Defendants and/or their

agents, employees, and co-conspirators in violation of the federal False Claims Act

("FCA"), 31 U.S.C. §§ 3729 *et seq.*; the Fraud Enforcement Recovery Act of 2009

("FERA"), 31 U.S.C. § 3729 *et seq*.; Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b *et seq*.; the Eliminating Kickbacks in Recovery Act ("EKRA"), 18 U.S.C. § 220; and Section 1877 of the Social Security Act ("Stark Law"), 42 U.S.C. § 1395nn.

2.

Relator brings this *qui tam* action based upon direct, firsthand knowledge of the fraudulent acts of Defendants as described in this Complaint.

## **THE PARTIES**

3.

The United States is a real party in interest to the claims in this action. Through the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), the United States administers the Medicare, Tricare, and Medicaid programs.

4.

Plaintiff/Relator Alex DiGiacomo is the former billing manager of Defendant Genotox in Austin, TX. He is currently a resident of Texas.

5.

Defendant Dr. Matthew F. McCarty is an anesthesiologist located in Austin, TX. He is the CEO and founder of Defendant Genotox Laboratories, Ltd., which

performs urine drug testing and other laboratory services.  He currently resides at 4406 Michaels Cove, Austin, TX 78746.

6.

Defendant Genotox Laboratories, Ltd. ("Genotox") is a Texas limited partnership with a principal address of 4406 Michaels Cove, Austin, TX 78746, and business address of 2170 Woodward St., #100, Austin, TX 78744-1038.  Its registered agent is Defendant Matthew F. McCarty, 4406 Michaels Cove, Austin, TX 78746.  Its general partner is Genotox Laboratories Management, LLC, whose address is also 4406 Michaels Cove, Austin, TX 78746, and whose managing members are Matthew F. McCarty and Teresa McCarty.

7.

Defendant Matthew F. McCarty, MD PLLC d/b/a Balcones Pain Consultants ("Balcones") is Dr. McCarty's pain management clinic.  Its principal office address is 5200 Davis Ln, Ste. B200, Austin, TX 78749.  Its members are listed as Matthew F. McCarty, 4406 Michaels Cove, Austin, TX 78746, and Angus Lowry, M.D., 2800 Bartons Bluff Ln 27, Austin, TX 78746.  Its registered agent is Capitol Corporate Services Inc., 800 Brazon Ste. 400, Austin, TX 78701.  Dr. McCarty is also registered as the manager.

8.

Defendant Genorite Pharmacy, LLC (f/k/a Barton Ridge Pharmacy, LLC) ("Genorite") is Dr. McCarty's pharmacy.  It is located at 5200 Davis Ln, Ste. B110, Austin, TX 78749.  It is registered as a subsidiary of Matthew F. McCarty, MD PLLC.  Dr. McCarty is listed as its registered agent.  Its members are listed as Matthew F. McCarty and Angus Lowry, M.D.

9.

Defendant Your Laboratory, L.P. d/b/a Your Health Lab ("Your Health") is another clinical laboratory in Texas with whom Defendant Genotox has a business relationship.  It is a Texas limited partnership whose principal office address is 2110 N. Navarro St., Victoria, TX 77901.  Its registered agent is Cory Kruger, 2211 Norfolk, Ste. 211, Houston, TX 77098-4166.  Its general partner is Your Laboratory GP, Inc., 2710 Hospital Drive, Victoria, TX 77901.

10.

Defendant Robert ("Bobby") Garcia is believed to be the Chief Commercial Officer of Your Health.  He resides at 2702 Stonebriar Ct., Arlington, TX 76001.

11.

Defendant Bearden Healthcare Associates, Inc. ("Bearden") is a Tennessee corporation with a principal business address of 10321 Kingston Pike, Knoxville,

TN 37922-3224.  Its registered agent is Glenn Johnson, 10321 Kingston Pike, Knoxville, TN 37922-3224.

12.

Defendant Screven County Hospital, LLC d/b/a Optim Medical Center-Screven/Optim Healthcare ("Optim Healthcare") is a Georgia limited liability company with a principal office address of 310 Seven Springs Way, Suite 500, Brentwood, TN 37027.  Its registered agent is Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, GA 30092.  Optim Healthcare is no stranger to the FCA.  In 2014, Optim Healthcare paid $4 million to settle claims that it had submitted improperly inflated claims for medical treatment at its Tattnall County facility and had violated the Stark Law by referring patients to related entities.

13.

Defendant New Beginnings Recovery Center, Inc. ("New Beginnings") is a Colorado corporation with a principal business address of 191 E. Orchard Rd., A, Littleton, CO 80121.  Its registered agent is Mary Brewer, 191 E. Orchard Rd., A, Littleton, CO 80121.

14.

Defendant Chicago Pain Medicine Center S.C. ("Chicago Pain") is an

Illinois corporation with a principal business address of 1044 N. Francisco Ave.,

Ste. 404, Chicago, IL 60622.  Its registered agent is James Diesfeld, 850 W. Irving

Park Rd., #203, Chicago, IL 60613.

15.

Defendant James R. Diesfeld is a pain management doctor in Chicago, IL

and a principal of Defendant Chicago Pain.  He resides at 3142 N. Clifton Ave.,

Chicago, IL 60657-3315.

## JURISDICTION AND VENUE

16.

This Court has jurisdiction over the parties and the subject matter of the

claims brought in this action under the FCA pursuant to 28 U.S.C. § 1331 and 31

U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court

for actions brought pursuant to 31 U.S.C. § 3729 and 3730.

17.

Under 31 U.S.C. § 3730(e)(4), there has been no statutorily relevant public

disclosure of the "allegations or transactions" in this Complaint, and, to the extent

any party asserts that there was any such relevant public disclosure, as set forth

below, Relator is an original source of the information on which this action is based and voluntarily provided that information to the U.S. Government before filing suit.

18.

Venue is appropriate as to each Defendant, in that at least one of the Defendants can be found in, transacts business in, and/or committed an act proscribed by the FCA in this judicial district.  Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

19.

Relator has presented the U.S. Government with timely disclosures regarding the FCA violations described herein as required by 31 U.S.C. § 3730(b)(2).

20.

On information and belief, the Defendants are the individuals and corporate entities that committed the unlawful and fraudulent activities alleged in this Complaint.  To the extent any related corporate entities or persons also engaged in such unlawful conduct, Relator hereby gives notice he seeks to hold any such related corporate entities or persons liable for such unlawful conduct.

## APPLICABLE LAW

### *The False Claims Act ("FCA")*

21.

Relator brings this action pursuant to the FCA.  The FCA is a federal statute

that creates a cause of action against persons who defraud the U.S. Government.

The FCA allows persons having information about a violation of the FCA, called

"relators," to bring an action on behalf of the Government and to share in any

recovery.

22.

The FCA was originally enacted during the Civil War to combat fraud

committed by defense contractors.  In 1986, Congress amended the statute to

enhance the U.S. Government's ability to recover losses sustained as a result of

fraud committed against the United States after finding that fraud in federal

programs was pervasive, and that the FCA, which Congress characterized as the

primary tool for combating Government fraud, was in need of modernization.

Congress intended that the amendments create incentives for individuals with

knowledge of fraud being committed against the United States to disclose that

information without fear of reprisals or Government inaction, and to encourage the

private bar to commit legal resources to prosecuting fraud on the Government's behalf.

23.

The FCA provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for payment or approval is liable to the U.S. Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A).

24.

The FCA provides further that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(B).

25.

The FCA provides further that any person who conspires to commit a violation of subparagraph (A) and/or subparagraph (B) of 31 U.S.C. § 3729(a)(1) is liable to the United States Government both for a civil penalty and for three times

the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(C).

26.

The current civil penalty under the FCA is not less than $11,463 and not more than $23,331 per false claim made.  20 C.F.R. § 356.3.

27.

The FCA defines a "claim" to include any request or demand made upon an agency of the United States for payment of money.  31 U.S.C. § 3729(b)(2).

28.

No proof of specific intent to defraud is required to prove a FCA violation. The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; *or* (2) acts in deliberate ignorance of the truth or falsity of the information; *or* (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).

29.

The FCA requires relators to file complaints under seal.  The complaint then remains under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.  After such time and any extensions of

thee seal granted by the Court, the Government may either elect to intervene in the case and prosecute the case on its own, or it may decline to intervene in the case and allow the relator to prosecute the case on the Government's behalf.  In either event, the relator is entitled to a percentage of the recovery made on the Government's behalf as well as attorney's fees and expenses.

### *The Federal Anti-Kickback Statute ("AKS")*

30.

The federal AKS is a criminal statute that prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment *may* be made under a federally-funded health insurance program.  42 U.S.C. § 1320a-7b(b).

31.

Under the AKS, no person or entity may offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce a physician or anyone else to order or recommend products or services sold by that person or entity that *may* be paid for by a federal health insurance program.  *Id.*

32.

The AKS does not merely prohibit outright bribes; the AKS also prohibits any form of payment of something of value by a person or entity that has *as one of* its purposes the inducement of a physician to purchase, use, or prescribe the person's or entity's products or services.

33.

Persons or entities that violate the AKS are subject to exclusion from participating in federal health insurance programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

34.

In March 2010, Congress amended the AKS to explicitly provide that a claim submitted for payment by the Government that is tainted by a prohibited kickback under the AKS constitutes a false or fraudulent claim for purposes of civil liability under the FCA. 42 U.S.C.A. § 1320a-7b(g).

### *The Eliminating Kickbacks in Recovery Act ("EKRA")*

35.

EKRA is a criminal statute that prohibits accepting or paying kickbacks for referrals to laboratories, among other providers. 18 U.S.C. § 220(a).

36.

Congress enacted EKRA in 2018 as part of the Substance Use-Disorder

Prevention that Promotes Opioid Recovery and Treatment for Patients and

Communities Act (the "SUPPORT Act").

37.

Under EKRA:

whoever, with respect to services covered by a health care benefit
program, in or affecting interstate or foreign commerce, knowingly and
willfully--(1) solicits or receives any remuneration (including any
kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in
cash or in kind, in return for referring a patient or patronage to a
recovery home, clinical treatment facility, or laboratory; or (2) pays or
offers any remuneration (including any kickback, bribe, or rebate)
directly or indirectly, overtly or covertly, in cash or in kind--(A) to
induce a referral of an individual to a recovery home, clinical treatment
facility, or laboratory; or (B) in exchange for an individual using the
services of that recovery home, clinical treatment facility, or laboratory,
shall be fined not more than $200,000, imprisoned not more than 10
years, or both, for each occurrence.

18 U.S.C. § 220(a).

38.

Unlike the AKS, EKRA broadly applies to all payors rather than being

limited to federal health care programs such as Medicare.

39.

Under 18 U.S.C. § 220(e)(5), "the term 'health care benefit program' has the meaning given the term in [18 U.S.C. § 24(b)]," which is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."  18 U.S.C. § 24(b).

40.

EKRA broadly applies to all laboratories, not just those performing toxicology screening.

41.

Under 18 U.S.C. § 220(e)(4), "the term 'laboratory' has the meaning given the term in section 353 of the Public Health Service Act," which is "a facility for the biological, microbiological, serological, chemical, immuno-hematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings."  42 U.S.C. § 263a(a).

42.

EKRA does not apply to conduct that is prohibited by, nor does it preempt, the federal AKS. 18 U.S.C. § 220(d)(1). EKRA does, however, prohibit certain forms of remuneration that are not covered under the federal AKS.

### *Section 1877 of the Social Security Act ("Stark Law")*

43.

Section 1877 of the Social Security Act – known as the "Stark Law" – prohibits physicians from referring patients to receive "designated health services" payable by Medicare or Medicaid from entities with which the physician or an immediate family member has a financial relationship, unless an exception applies. 42 U.S.C. § 1395nn.

44.

Under the Stark Law:

> if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then-- (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

45.

Under 42 U.S.C. § 1395nn(g)(1), "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1)."

46.

Under the Stark Law, financial relationships include both ownership or investment interests as well as compensation arrangements.

47.

Under the Stark Law, "designated health services" includes "clinical laboratory services." 42 U.S.C. § 1395nn(h)(6)(A).

48.

The Stark Law is a strict liability statute, which means proof of specific intent to violate the law is not required.

49.

Penalties for persons who violate the Stark Law include fines as well as exclusion from participation in federal health care programs.

50.

Under 42 U.S.C. § 1395nn(g)(3), "Any person that presents or causes to be presented a bill or a claim for a service that such person knows or should know is

for a service for which payment may not be made under paragraph (1) or for which a refund has not been made under paragraph (2) shall be subject to a civil money penalty of not more than $15,000 for each such service."

51.

Under 42 U.S.C. § 1395nn(g)(4), "Any physician or other entity that enters into an arrangement or scheme (such as a cross-referral arrangement) which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil money penalty of not more than $100,000 for each such arrangement or scheme."

## **FACTUAL BACKGROUND**

52.

Genotox is a toxicology and pharmacogenetics testing laboratory based in Austin, TX. It is owned by Dr. McCarty and his wife, Theresa McCarty.

53.

Broadly speaking, Genotox performs urine drug tests. Medical providers, other laboratories, and sometimes patients send urine samples to Genotox. Genotox tests these urine samples for the presence and quantity of drugs, both

legal and illicit, and then Genotox sends a report to the medical provider or laboratory detailing the results.

54.

Genotox offers its services to providers, laboratories, and patients throughout the United States.

55.

Genotox has sales representatives that market Genotox's services to providers, laboratories, and patients throughout the United States.

56.

Genotox also has agents it refers to as specimen collectors (also called "specimen processors" or "SPs"), who typically work inside of medical practices and who collect and process urine samples to send to Genotox for testing on behalf of the practice in which the SP works. Genotox has SPs working in practices throughout the United States.

57.

With some exceptions, Genotox generally submits claims to payors, including to federal health care programs such as Medicare as well as commercial insurers, for each urine drug test it performs.

58.

Relator is the former billing manager for Genotox.  He worked there for approximately five years before resigning in June 2020.  Relator was generally responsible for Genotox's overall revenue cycle management.  Relator reported to Genotox's COO, Shawn Lunney, and had five billing associates who reported to him as billing manager.

59.

As the former billing manager, Relator is familiar with Genotox's billing practices and the claims Genotox submitted for payment to federal and state health care programs as well as commercial payors.

60.

As the former billing manager, Relator is also familiar with Genotox's relationships with Defendants Balcones, Genorite, Your Health, Robert Garcia, Bearden, New Beginnings, Chicago Pain, Diesfeld, and Optim Healthcare – including claims submitted for payment to federal and state health care programs as well as commercial payors which originated from services performed by Genotox for those Defendants and as described in this Complaint.

61.

Generally, Defendant Genotox has business relationships with each of the other Defendants in this case.  Genotox has either performed laboratory services for the other Defendants or had financial arrangements with the other Defendants related to Genotox's laboratory testing services.

62.

The various violations that Defendants have committed and that constitute the basis of the FCA violations alleged herein are described below.

### *Kickback Payments to Sales Representatives*

63.

Genotox pays its sales representatives commissions based off of the number of laboratory tests or the amount of revenue the sales representative generates in addition to a base salary the sales representative receives.

64.

Genotox's commission payments to its sales representatives constitute unlawful kickbacks under federal law.

65.

Many of Genotox's sales representatives, including those who are paid commissions, are now, or previously were, independent contractors rather than bona fide employees of Genotox.

66.

Genotox sales representatives Chris Good, Attaul Shahid, Angela Lake, Armando Olvera, Vincent Broussard, Jan Brooks, Christy Stroup, and Nichole McNair were independent contractors as of January 2020 and were paid commissions by Genotox based on the number of tests or revenue they generated, some claims for which were paid by federal health care programs. Upon information and belief, other Genotox sales representatives who are or were independent contractors were also paid commissions by Genotox based on the number of tests or the amount of revenue they generated, including commissions for tests that were paid for by federal health care programs.

67.

Some Genotox sales representatives are also classified as "employees" on Genotox's books. Internal Genotox documents, however, still refer to all sales representatives as 1099 independent contractors despite Genotox's attempt to classify some of its sales representatives as "employees."

68.

Genotox sales representative Nathan Bouchillon was an employee of

Genotox as of March 2019 and was paid commissions based upon the number of

tests or the amount of revenue he generated. Bouchillon was based in Colorado

and had an annual base pay in 2019 of $55,000. During the pay period ending on

March 22, 2019, he was paid $33,462.37, nearly ten times what he was paid during

the prior pay period of approximately $3,500. Commission payments based on

revenue generated were the reason for the substantial increase from one pay period

to the next.

69.

Other Genotox sales representatives who were nominally called employees

of Genotox received similar commission-based compensation as Bouchillon based

on the number of tests or the amount of revenue they generated, including

commissions for tests that were paid for by federal health care programs.

70.

A number of Genotox sales representatives have also entered into

"marketing services agreements" ("MSAs") with Genotox. These MSAs are

contracts which provide that the sales representatives are performing marketing

services on behalf of Genotox.

71.

Sales representatives who have entered into MSAs with Genotox include both independent contractors and nominal "employees" of Genotox. Like other sales representatives of Genotox, they are also paid commissions based off of the number of tests or the amount of revenue they generate, including commissions for tests that were paid for by federal health care programs.

72.

Genotox COO Shawn Lunney decided to implement MSAs in early 2019 in order to exert more control over Genotox sales representatives. Lunney determined which Genotox sales representatives would be placed under a MSA.

73.

Genotox sales representatives Char Schraibman, John Neal, Lyle Osburn, Robert Close, Brendan Pike, Jose Recio, Larry Trujillo, Frank Lavian, and Dan Higley were all Genotox sales representatives who had entered into MSAs with Genotox as of January 2020 and who were paid commissions by Genotox based on the number of tests or the amount of revenue they generated, including commissions for tests that were paid for by federal health care programs.. Upon information and belief, other Genotox sales representatives who had entered into MSAs with Genotox were also paid commissions by Genotox based on the number

of tests or the amount revenue they generated, including commissions for tests that were paid for by federal health care programs.

74.

Genotox's commission payments to sales representatives who were independent contractors at the time of payment and that were based off of the number of tests or the amount of revenue generated for Genotox violate the AKS because they are volume-based payments designed to induce referrals of laboratory tests, including payments for tests that were paid for by federal health care programs.

75.

Genotox's commission payments to sales representatives who were employees of Genotox at the time of payment and that were based off of the number of tests or revenue generated for Genotox violate EKRA because they are volume-based payments designed to induce referrals of laboratory tests, including payments for tests that were paid for by federal health care programs.

76.

To the extent that sales representatives were called employees, but who were in fact not bona fide employees, payments to such representatives that were based

off of the number of tests or the amount of revenue generated for Genotox violate the AKS.

77.

Claims Defendants submitted to federal health care programs that are tainted by unlawful kickback relationships prohibited by the AKS or EKRA are materially false claims under the FCA.

78.

Because Genotox's sales representatives have been paid compensation based on the volume of referrals for at least 5 years and likely longer, Defendants have submitted **tens of thousands** of false claims for tests tainted by Genotox's kickback scheme and have caused millions of dollars in damages to the U.S. Government.

### *Kickback Payments to SPs and Medical Practices in Which SPs Work*

79.

Similar to its sales representatives, Genotox pays its SPs (specimen collectors/processors) commissions based off of the number of laboratory tests or the amount of revenue the SPs generate.

80.

Genotox's commission payments to its SPs constitute unlawful kickbacks under federal law.

81.

Genotox's SPs work inside of medical practices.

82.

By law, SPs are only allowed to perform specimen collection and processing for Genotox.  SPs are not allowed to perform additional work for the medical practices in which they work outside of specimen collection and processing.

83.

Genotox pays SPs to collect urine specimens from patients of the medical practices where they work and to send them to Genotox for testing.  Some of Genotox's SPs also receive payment directly from the practices, and nearly all of the SPs are paid by the number of samples collected by Genotox.

84.

Some SPs who are being paid by both the practice and Genotox were already employed by the practice and Genotox recruited those employees to be SPs for Genotox within the practice.

85.

Many of Genotox's SPs are independent contractors, not employees of Genotox.

86.

The following Genotox SPs were all considered independent contractors and were paid commissions by Genotox based on the number of samples or the amount of revenue generated during 2018 and/or 2019 (with the information in parentheses indicating either the state or practice in which they worked): Natalie Aguilar (Texas), Ameen Babalmorad, Chris Brewer (Defendant New Beginnings), Kimberly Brown, Rachel Colburn, Deborah Diaz (Specialized Family Clinic), Marcus Ford (Collegial Behavioral Health), Griselda Gayton (Florencia Perez & Assoc.), Lillian Hernandez, Amjad Jolak (Spectrum Medical), Travis Morse (Defendant New Beginnings), Cynthia Rabanal (Advanced Spine and Pain) (Connecticut), Dora Rojas, Daniela Ruiz (Valley Internal Medicine), Patricia Saucedo, Kathryn Selner (Sage Recovery & Wellness), Timur Tashkulov (Rocky Mountain Internal Medicine), Leslie Trevino (McAllen Family Medical), Alexander Trujillo (Defendant New Beginnings), and Natasha West.  Upon information and belief, there were other Genotox SPs in addition to these who

were considered independent contractors and who were paid commissions by

Genotox based on the number of samples or revenue generated.

87.

The following Genotox SPs, who were all considered independent

contractors and who were paid commissions by Genotox based on the number of

samples or the amount of revenue generated during 2018 and/or 2019, were also

paid by the practices for whom they worked (with the information in parentheses

indicating either the state or practice in which they worked): Chris Brewer

(Defendant New Beginnings), Deborah Diaz (Specialized Family Clinic), Griselda

Gayton (Florencia Perez & Assoc.), Travis Morse (Defendant New Beginnings),

Cynthia Rabanal (Advanced Spine and Pain), Kathryn Selner (Sage Recovery &

Wellness), Timur Tashkulov (Rocky Mountain Internal Medicine), and Alexander

Trujillo (Defendant New Beginnings).  Upon information and belief, there were

other Genotox SPs in addition to these who were considered independent

contractors and who were paid commissions by Genotox based on the number of

samples or the amount of revenue generated and were also paid by the practices for

whom they worked.

88.

As with Genotox's sales representatives, Genotox's commission payments to

SPs who were independent contractors at the time of payment and that were based

off of the number of tests or revenue generated for Genotox violate the AKS

because they are volume-based payments designed to induce referrals of laboratory

tests, including payments for tests that were paid for by federal health care

programs.

89.

Genotox's commission payments to SPs who were employees of Genotox at

the time of payment and that were based off of the number of tests or revenue

generated for Genotox violate EKRA because they are volume-based payments

designed to induce referrals of laboratory tests, including payments for tests that

were paid for by federal health care programs.

90.

In addition to the commissions Genotox pays its SPs, Genotox is also paying

kickbacks to the medical practices in whose offices the SPs work. These

kickbacks consist of: 1) allowing SPs to perform work for the medical practices

beyond processing samples for Genotox; and 2) paying the medical practices to

"rent" office space for the SPs within the medical practice.  Both of these practices constitute unlawful remuneration and violations of the AKS or EKRA.

91.

Genotox's SPs performing any kind of work for the practice beyond collecting and processing urine samples to send to Genotox provides something of value to the practice and is a form of prohibited remuneration under the AKS or EKRA.

92.

For example, Genotox SPs working for Defendant New Beginnings in Colorado performed office and clerical work for the practice in addition to sample collection and processing for Genotox.  The additional work Genotox SPs performed for Defendant New Beginnings is a form of prohibited remuneration under the AKS or EKRA.

93.

As another example, all Genotox SPs working for practices in North Carolina with whom Genotox did business simultaneously worked as both medical assistants for the practice and SPs for Genotox.

94.

Relator believes the following current and former North Carolina SPs simultaneously worked as both medical assistants for the practice and SPs for Genotox: Marcus Ford with Collegial Behavioral Health; Amjad Jolak with Spectrum Medical; Deidri Sanderson with Triad Psychiatric and Counseling Center; Josephine Eller with Robert Bloomfield, MD; Kiara Williams with Triad Psychiatric and Counseling Center; Brittany Biotnott with Triad Psychiatric and Counseling Center; Kendra Knight with Daniel Medical Services; Tina Brown with Triad Psychiatric and Counseling Center; Amber Davis with Greater Image; Saleethip Torwiwat with Triad Psychiatric and Counseling Center; Whitney Leak with Triad Psychiatric and Counseling Center; and Sherrie Higgins with Carolina Heart Care.

95.

Genotox also pays certain medical practices "rent" for office space for Genotox's SPs, which in reality are additional kickbacks that Genotox has attempted to disguise.

96.

For example, Genotox paid rent for SPs working for Defendant New

Beginnings; Defendants Chicago Pain and Diesfeld; and all Genotox clients in

Kentucky who have Genotox SPs working within the practice.

97.

Genotox's payments of "rent" for unnecessary office space, or rental of

office space at greater than fair market value, from medical practices where its SPs

work also constitutes prohibited remuneration under the AKS or EKRA.

98.

Each claim Defendants submitted to a federal health care program for

payment which was tainted by an unlawful kickback to a Genotox SP or to a

medical practice in violation of the AKS or EKRA constitutes a false claim under

the FCA.

99.

Each claim Defendants submitted to a federal health care program for

payment which originated from a practice to which Genotox paid unlawful

kickbacks in violation of the AKS or EKRA constitutes a false claim under the

FCA. Because Genotox's SPs have been paid improper compensation based on the

volume of referrals for at least 5 years and likely longer and Genotox has made

improper kickback payments in the form of rent and free labor, Defendants have submitted ***tens of thousands*** of false claims for tests tainted by Genotox's kickback scheme and have caused millions of dollars in damages to the U.S. Government.

### *Kickbacks to Medical Practices with whom Genotox has "Hybrid" Billing Arrangements*

100.

Genotox has entered into agreements with certain practices that Genotox refers to as "hybrid" billing arrangements.

101.

Under these "hybrid" arrangements, Genotox bills the practice directly for toxicology tests for patients covered by commercial insurers, rather than submitting claims for payment directly to the insurer. Instead of Genotox submitting an insurance claim, the practice submits a claim to the commercial insurer for payment of the same test. The practice then "pockets" the difference between what it paid to Genotox for the toxicology test and what the commercial insurer paid the practice pursuant to the practice's claim.

102.

For patients covered by governmental payors like Medicare, however, Genotox submits a claim for payment directly to the governmental payor for that patient rather than to the practice and the governmental payor pays Genotox directly.

103.

This arrangement violates the AKS or EKRA because the "spread" that Genotox allows these practices to keep on commercial claims is a form of unlawful remuneration designed to induce the practices to refer all of their toxicology test orders to Genotox, including tests paid for by governmental payors.

104.

The HHS OIG expressed concern over such arrangements in a 2014 Special Fraud Alert directed at laboratory payments to referring physicians. The OIG stated that billing arrangements which "carve out" federal claims from otherwise suspect billing and/or payment arrangements may still implicate the AKS. The OIG stated that:

> OIG's concerns regarding Specimen Processing Arrangements are not abated when those arrangements apply only to specimens collected from non-Federal health care program patients. Arrangements that "carve out" Federal health care program beneficiaries or business from otherwise questionable arrangements implicate the anti-kickback statute and may violate it by disguising remuneration for Federal health

care program business through the payment of amounts purportedly related to non-Federal health care program business. **Because physicians typically wish to minimize the number of laboratories to which they refer for reasons of convenience and administrative efficiency, Specimen Processing Arrangements that carve out Federal health care program business may nevertheless be intended to influence physicians' referrals of Federal health care program business to the offering laboratories.**

2014 OIG Special Fraud Alert (emphasis added).

105.

The HHS OIG has also raised concerns with such arrangements in prior advisory opinions. In OIG Advisory Opinion No. 12-06, the OIG stated that:

> OIG has a long-standing concern about arrangements under which parties "carve out" Federal health care program beneficiaries or business generated by Federal health care programs from otherwise questionable financial arrangements. Such arrangements implicate, and may violate, the anti-kickback statute by disguising remuneration for Federal health care program business through the payment of amounts purportedly related to non-Federal health care program business. Here, although the Centers would charge the Requestor Management Services fees only with respect to non-Federal health care program patients, the Requestor would serve as the exclusive provider of anesthesia services for all of the Centers' patients, including Federal health care program beneficiaries. Thus, carving out Federally insured patients under Proposed Arrangement A does not reduce the risk that the Requestor's payments to the Centers for Management Services would be paid to induce referrals to the Requestor of Federally insured patients.

OIG Advisory Opinion No. 12-06.

106.

And in OIG Advisory Opinion No. 99-13, the HHS OIG stated with respect

to a proposed arrangement that:

> a nexus may exist between the discount to the physicians for non-
> Federal health care program business and referrals of Federal health
> care program business. First, the physicians are in a position to direct a
> significant amount of Federal health care program business to
> Company A that is not covered by the account billing component of the
> Proposed Arrangement. Second, both parties have obvious motives for
> agreeing to trade business: the physicians have the opportunity to make
> a larger profit on the non-Federal health care program business, and
> Company A is able to secure profitable Federal health care program
> business in a highly competitive market. Third, Company A has
> represented that it is likely that physicians who have account billing
> arrangements with Company A will refer Federal health care program
> business to Company A as a matter of practical convenience.

OIG Advisory Opinion No. 99-13.

107.

Genotox has or had in the past "hybrid" billing arrangements with Defendant

Bearden and Defendant Optim Healthcare. Upon information and belief, Genotox

has or had in the past "hybrid" billing arrangements with other practices as well.

108.

Genotox attempted to facilitate "hybrid" arrangements with other practices,

but practices would often receive pushback and claim denials from commercial

payors when the practice attempted to submit claims for toxicology tests rather than Genotox.

109.

Each claim Defendants Genotox, McCarty, Bearden, or Optim Healthcare has submitted or caused to be submitted to a federal health care program pursuant to a "hybrid" billing arrangement was a materially false claim under the FCA because it was tainted by an unlawful AKS or EKRA violation. Because Genotox has had these hybrid payment arrangements in place for years, Defendants Genotox, McCarty, Bearden, or Optim Healthcare have submitted *tens of thousands* of false claims for tests tainted by Genotox's kickback scheme and have caused millions of dollars in damages to the U.S. Government.

### *Self-Referrals among Dr. McCarty's Entities*

110.

In addition to Genotox, Defendant McCarty and/or his wife Theresa McCarty also have ownership and/or financial interests in both Defendant Genorite, a pharmacy, and Defendant Balcones, a pain management clinic.

111.

Defendant Genotox had a contract with Defendant Genorite whereby Genorite refers patients to Genotox for toxicology and genetic testing. *See* Exs. A

and B.  During the time of Relators' employment with Genotox, Genorite referred

approximately five to ten patients per month to Genotox.  Some of these patients'

tests were paid for by federal health care programs.

112.

Defendant McCarty also referred hundreds of his patients per year at

Balcones for laboratory testing at Genotox whose claims were reimbursed by

federal health care programs.  For example, between July, 2016 and July, 2018,

Balcones referred numerous patients to Genotox for urine drug testing.  *See* Ex. C.

113.

Defendant Balcones was also included among the Genotox providers that

had "custom toxicology profiles" for orders of laboratory tests from Genotox,

several of which were signed by Dr. McCarty.  *See* Ex. D.

114.

Defendant McCarty clearly treated Genotox, Balcones, and Genorite as

essentially a single entity with no distinction between the three, freely referring

Genorite and Balcones patients to Genotox.  *See* Ex. E (2014-05-05 McCarty

Email to McLerran).

115.

Defendants McCarty, Genotox, Genorite, and Balcones have committed numerous violations of the Stark Law through Defendant McCarty's self-referral of patients from Genorite and Balcones to Genotox for laboratory testing.

116.

Dr. McCarty and/or Theresa McCarty profit from these self-referrals by double dipping, earning money from both Genorite's or Balcones's claims for those patients as well as Genotox's claims for the same patients that are submitted to federal health care programs for payment.

117.

Each referral from either Genorite or Balcones to Genotox is a violation of the Stark Law due to Dr. McCarty's or his wife Theresa McCarty's ownership and/or financial interest in these entities.

118.

All claims to federal health care programs submitted in connection with such referrals constitute material violations of the Stark Law and FCA for which these Defendants are liable for treble damages and civil monetary penalties.  Because Defendants Genotox, McCarty, Balcones, and Genorite have been engaged in self-

referrals for years, Defendants Genotox, McCarty, Balcones, and Genorite have submitted false claims for tests tainted by their Stark Law violations.

### *The Submission of Claims for Medically Unnecessary and Unreasonable Urine Drug Tests Through the Use of "Custom Toxicology Profiles"*

119.

Defendant Genotox routinely promotes to and provides its clients with standing orders to be signed by the client and kept on file with Genotox. Genotox referred to these documents as both "standing orders" and, more recently, "custom toxicology profiles."

120.

Genotox's "custom toxicology profiles"/standing orders are not customized for individual patients. Instead, any patient whose urine sample was sent to Genotox for testing pursuant to a client's "custom toxicology profile"/standing order would be subject to the complete battery of tests that had been selected on the "custom toxicology profile"/standing order, without regard to whether the patient's sample needed to be subject to such an extensive test based on medical need.

121.

For nearly all of Genotox's clients, Genotox's sales reps would fill out "custom toxicology profiles"/standing orders for the doctor or, in the case of a practice, each doctor at the practice by checking the boxes necessary to ensure that any test submitted pursuant to one of these "custom toxicology profiles"/standing orders would be a full presumptive and definitive/qualitative test, regardless of individual patient need.

122.

Every client would then sign a pre-filled "custom toxicology profile"/standing order that would be applied to all toxicology test orders for that practice's or doctor's patients.

123.

For example, this "custom toxicology profile" for Parkwood Podiatry Associates in Brunswick, GA (Ex. F hereto) was pre-filled by a Genotox sales rep so that each and every presumptive and definitive test would be performed on each patient's sample submitted pursuant to this standing order:

From: PARKWOOD PODIATRY          912 267 9857          01/09/2018 08:07          #920 P.002/002

**GENOTOX LABORATORIES**

**Custom Toxicology Profile**

Practice Name: Parkwood Podiatry

Sales Group/Representative: Jenny Lee

☐ Always perform ToxProtect™, if applicable

☐ Perform full presumptive screening which includes all analytes and categories listed below, OR
☐ Perform the customized screening indicated below

| | | | | | |
|---|---|---|---|---|---|
| ☐ 6-MAM | ☐ Barbiturates | ☐ THC | ☐ Opiates | ☐ TCA | ☐ PCP |
| ☐ Amphetamines | ☐ Cocaine Metabolite | ☐ Methadone | ☐ Oxycodone | ☐ Benzodiazepines | ☐ Buprenorphine |

☐ Reflexively quantify all drugs with a positive screening and/or an unexpected negative screening
☐ Perform full definitive LC-MS/MS test which includes all analytes and metabolites listed below, OR
☐ Perform the customized testing indicated below

| OPIATES AND OPIOIDS | ☐ | BENZODIAZEPINES | ☐ | SEDATIVE HYPNOTICS | ☐ | ADDITIONAL DRUGS | ☐ |
|---|---|---|---|---|---|---|---|
| Buprenorphine* | ☐ | Alprazolam* | ☐ | Diphenhydramine | ☐ | Cotinine | ☐ |
| Codeine* | ☐ | Chlordiazepoxide* | ☐ | Zolpidem* | ☐ | Gabapentin | ☐ |
| Dextromethorphan* | ☐ | Clonazepam* | ☐ | **ANTIDEPRESSANTS** | | Ketamine* | ☐ |
| Fentanyl* | ☐ | Diazepam* | ☐ | Amitriptyline* | ☐ | Mitragynine | ☐ |
| Hydrocodone* | ☐ | Estazolam | ☐ | Bupropion* | ☐ | Pregabalin | ☐ |
| Hydromorphone* | ☐ | Flurazepam*† | ☐ | Citalopram* | ☐ | Prazosin* | ☐ |
| Meperidine* | ☐ | Flurazepam* | ☐ | Desipramine* | ☐ | **ALCOHOL METABOLITE** | |
| Methadone* | ☐ | Lorazepam* | ☐ | Doxepin* | ☐ | Ethyl Sulfate | ☐ |
| Morphine* | ☐ | Midazolam | ☐ | Duloxetine | ☐ | **DESIGNER AMPHETAMINES** | |
| Naloxone*† | ☐ | Oxazepam | ☐ | Fluoxetine | ☐ | BZP / MDEA / MDMA | ☐ |
| Naltrexone* | ☐ | Temazepam* | ☐ | Imipramine* | ☐ | **ILLICIT DRUGS** | |
| Oxycodone* | ☐ | Triazolam† | ☐ | Mirtazapine | ☐ | 6-Monoacetyl Morphine* | ☐ |
| Oxymorphone | ☐ | **ANTIPSYCHOTICS** | | Mirtazapine*† | ☐ | Cocaine* | ☐ |
| Pentazocine | ☐ | Haloperidol† | ☐ | Nortriptyline | ☐ | PCP | ☐ |
| Propoxyphene | ☐ | Quetiapine† | ☐ | Paroxetine | ☐ | **CANNABINOID** | |
| Tapentadol* | ☐ | Risperidone† | ☐ | Sertraline† | ☐ | THC | ☐ |
| Tramadol* | ☐ | **SKELETAL MUSCLE RELAXANT** | | Trazodone† | ☐ | **SYNTHETIC CANNABINOIDS** | |
| **NON-OPIOID ANALGESICS** | | Carisoprodol* | ☐ | Venlafaxine† | ☐ | AB-PINACA / 5F-AB-PINACA** | ☐ |
| Diclofenac*† | ☐ | Cyclobenzaprine* | ☐ | **BARBITURATES** | | RWN-018 / AM2201** | ☐ |
| Acetaminophen† | ☐ | Meprobamate | ☐ | Butalbital† | ☐ | IWM-073** | ☐ |
| Celecoxib† | ☐ | **STIMULANTS** | | Pentobarbital† | ☐ | UR-144 / XLR-11** | ☐ |
| Ibuprofen† | ☐ | Amphetamine | ☐ | Phenobarbital† | ☐ | **SYNTHETIC CATHINONES** | |
| Meloxicam† | ☐ | Ephedrine / Pseudoephedrine† | ☐ | Secobarbital† | ☐ | Alpha-PVP | |
| Naproxen† | ☐ | Methamphetamine* | ☐ | | | MDPV | |
| Salicylates*† | ☐ | Methylphenidate* | ☐ | | | Mephedrone | |
| | | Phentermine | ☐ | | | Methylone | |

☐ Always quantify the drugs on the patient's medication list, if applicable.

*Includes Metabolite(s)
†Not currently available for oral fluid toxicology samples

My signature below is an acknowledgment of the following: The custom profile offered by Genotox Laboratories is not an AMA approved profile. Nevertheless, I have deemed that these tests are medically necessary for my patient population. I have reviewed the CPT and HCPS codes, as well as the CMS Clinical Laboratory Fee Schedule, and I have maintained careful to this information and making my decision to use a custom profile. I understand that each additional test order may result in an additional charge to my patient and/or third-party payer. The use of a custom profile may result in the ordering of tests which may not be covered, reasonable or necessary for the treatment of beneficiaries' federally funded health care programs. The submission of claims to federally funded health care programs tests that are not covered, reasonable or medically necessary may result in a violation of the Civil False Claims Act. I will use my custom profile for patients only with a documented medical necessity to support the tests included. The CMS takes the position that any individual knowingly causing a false claim to be submitted to a federal health care program may be subjected to sanctions, penalties, fines and other remedies under civil, criminal and administrative law. My custom profile is effective for 1 year as of the date signed; however, I may make changes at any time.

Matthew Eller DPM   X [signature]   12.28.17

Practitioner Name (Please Print)     Signature     Date

Genotox Laboratories | clientservices@genotoxlabs.com | Phone 512-600-6601 | Fax 512-600-6602 | Rev 8 | 6/15/2017

124.

Under this Parkwood Podiatry "custom toxicology profile" signed by Dr. Eller, every single patient seen by Dr. Eller and who had a urine sample taken for testing would have had their sample tested by Genotox according to this standing order, which would include full presumptive and definitive testing for every drug listed on the standing order, regardless of that patient's particular medical need or diagnosis.

125.

There is no valid medical reason for every single patient of a podiatrist's practice who has his or her urine tested to have full presumptive and definitive testing performed by Genotox.

126.

Genotox has been using "custom toxicology profiles"/standing orders for many years. Their use pre-dated Relator's employment with Genotox. Genotox has used "custom toxicology profiles"/standing orders with hundreds of practices and physicians throughout the United States, and it continues to sign up new practices and physicians to use "custom toxicology profiles"/standing orders.

127.

Prior to using the phrase "custom toxicology profiles," Genotox referred to

them as "standing orders."  For example, this is a "standing order" for Amena

Healthcare Group (Ex. L hereto) dating from January 6, 2015:

128.

At some point in time, Genotox started calling its standing orders "custom

toxicology profiles" to avoid scrutiny from regulators such as CMS.

129.

"Custom toxicology profiles"/standing orders were implemented by COO

Shawn Lunney in order to increase Genotox's profitability.

130.

According to Mr. Lunney, Genotox would not make any money on "small

orders" – *i.e.* orders for tests which did not cover the full battery of toxicology tests

that could possibly be performed on a particular sample.  Therefore, Genotox

needed to use "custom toxicology profiles" – standing orders for the highest level

of test on each patient – to maximize the profit on samples Genotox processed.

131.

Genotox has submitted and continues to submit claims to federal health care

programs for payment under these "custom toxicology profiles"/standing orders.

132.

The custom toxicology profiles were all designed to be billed under Code

G0483 – the most comprehensive and highest reimbursement urine drug test.

133.

Genotox used "custom toxicology profiles"/standing orders with clients

throughout the United States, and specifically with clients located within this

judicial district, including Optimizing Your Health, Dr. Lourdes de Armas, in

Brunswick, GA and Parkwood Podiatry Associates, Dr. Brett Bodamer & Dr.

Matthew Eller, in Brunswick, GA.  *See* Exs. G and F.

134.

Genotox also used "custom toxicology profiles"/standing orders with

Defendants Optim Healthcare, Balcones, Bearden, and Chicago Pain/Diesfeld.  *See*

Exs. D, H, and I.  Each of these Defendants has submitted or caused to be

submitted to federal health care programs claims for tests performed pursuant to

"custom toxicology profiles"/standing orders.

135.

Medicare only pays for tests that are reasonable and necessary for the

treatment or diagnosis of an individual patient's illness or injury.  *See* 42 U.S.C. §

1395y(a)(l)(A).

136.

The need for each test for each patient must be individually assessed and

documented in the patient's medical chart.  *See* 42 C.F.R. §§ 410.32(a), (d)(2).

137.

Medicare regulations expressly state that a laboratory's claim for a service

will be denied if there is not sufficient documentation in the patient's medical

record to establish that the service was reasonable and necessary. *See* 42 C.F.R. § 410.32(d)(3).

138.

The tests Genotox caused most of its clients to order pursuant to "custom toxicology profiles"/standing orders were the most extensive and expensive tests that could be ordered, and such tests were routinely ordered for patients for which the tests were neither reasonable nor necessary, nor did the ordering doctor take into account each patient's individual need.

139.

By using "custom toxicology profiles"/standing orders, Genotox caused federal health care programs to spend money on tests that were neither reasonable nor necessary.

140.

Genotox's use of "custom toxicology profiles"/standing orders was so successful that for many years Genotox has been the number one submitter of claims for reimbursement under code G0483 in Texas. Genotox submitted as many tests under G0483 as the next five labs in Texas combined.

141.

Relator routinely warned Genotox COO Shawn Lunney and other Genotox
executives, including Dr. McCarty, in writing and verbally that the use of "custom
toxicology profiles"/standing orders was suspect and risked violation of federal
law.

142.

In January 2018, Relator made a detailed presentation to Genotox senior
management and owners including Dr. and Mrs. McCarty, COO Shawn Lunney,
Vice President of Operations and Chief Compliance Officer Liz Poulin, and others
specifically warning that the use of "custom toxicology profiles"/standing orders
was not allowed under federal health care programs.

143.

Relator also provided COO Lunney with multiple policies from payors such
as Blue Cross/Blue Shield, Humana, and Medicare providing that standing orders
were not to be used.

144.

Lunney consistently brushed off or ignored Relator's warnings.

145.

Genotox's "custom toxicology profiles"/standing orders caused an excessive

submission of claims for toxicology tests, both in overall number of tests as well as

in the particular types of tests ordered, to federal health care programs for payment.

146.

Genotox's "custom toxicology profiles"/standing orders caused overbilling

of federal health care programs because the excessive number and depth of tests

ordered pursuant to these profiles were neither reasonable nor medically necessary.

147.

Each and every claim submitted to a federal health care program for

payment which was billed under a Genotox "custom toxicology profile"/standing

order violated federal law and constitutes a materially false claim under the FCA.

Because Genotox. Because Genotox has used "custom toxicology

profiles"/standing for at least 5 years and likely longer, Defendants have submitted

*tens of thousands* of false claims.

### *Kickback Payments to Your Health COO Robert Garcia*

148.

Defendant Your Health Lab is a clinical lab located in Victoria, Texas.

149.

Genotox had a contract to provide toxicology testing services for Your Health, which does not perform toxicology testing.

150.

Genotox's contract was due to expire with Your Health in October, 2019. *See* Ex. J.

151.

To ensure that it kept the profitable Your Health account, Genotox "hired" its COO Bobby Garcia as a "sales rep." *See* Ex. K.

152.

Genotox and Garcia entered into a "Marketing Services Agreement" ("MSA") on September 20, 2019. Pursuant to this MSA, Genotox agreed to pay Garcia $42,525.00 annually. *Id.*

153.

Although Garcia was a former Genotox sales representative, since 2018 Garcia never performed any tasks or did any work for Genotox, other than ensure that Genotox kept the Your Health account.

154.

The MSA arrangement between Genotox and Garcia was a sham agreement designed to conceal a kickback relationship.

155.

The "salary" paid by Genotox to Garcia was in actuality a pure kickback in order to ensure that Genotox kept the valuable Your Health account.

156.

Genotox performed hundreds of toxicology tests for Your Health *per month*, generating thousands of dollars in revenue for Genotox, including tests paid for by federal health care programs.

157.

Each claim Defendants Genotox, McCarty, Your Health, and/or Garcia have submitted or caused to be submitted to a federal health care program was tainted by this unlawful kickback arrangement and rendered the claims materially false under the FCA.  Since September 20, 2019, there are hundreds, if not more, of such claims.

### *Up-Coding of Genotox Tests*

158.

Private laboratories can apply to the American Medical Association

("AMA") for new billing codes for proprietary tests. Those codes are called PLA

codes.

159.

The AMA states explicitly that, "[w]hen a PLA code is available to report a

given proprietary laboratory service, that PLA code takes precedence. The service

should not be reported with any other CPT code(s) and other CPT code(s) should

not be used to report services that may be reported with that specific PLA code."

*See CPT Proprietary Laboratory Analyses (PLA) Codes: Long Descriptors*,

American Medical Association, July 1, 2020.

160.

After the AMA has granted a PLA code to a laboratory, the laboratory can

submit the code to CMS to determine if Medicare will reimburse for the test

governed by the code. If approved, CMS then sets the reimbursement rate for that

particular code.

161.

In 2017, Genotox applied to the AMA for a PLA code for its proprietary

"ToxProtect" drug test.  The "ToxProtect" test is an office-based urine drug test

that incorporates a cheek swab that accompanies the urine sample and that is used

to verify through DNA matching that the urine sample belongs to the donor and

that the urine sample is neither synthetic nor a substitute.  It is designed to be

ordered by a licensed medical provider and to be billed to a third party for

payment.

162.

The AMA granted Genotox the PLA code 0007U for the ToxProtect test.

163.

In 2018, CMS accepted the new 0007U code and set a reimbursement rate of

$110 per test.  That reimbursement rate was $136 less than the reimbursement rate

for the existing G0483 CPT code, which is the code that Genotox had been using

for all of its urine drug tests.

164.

Despite applying for and receiving the PLA code for its ToxProtect test, and

despite running the ToxProtect protocol on most every sample Genotox tests,

Genotox continues to bill all of its tests using the G0483 code rather than switching

over to the 0007U code it had been granted and had submitted to CMS for approval.

165.

Genotox COO Shawn Lunney explicitly instructed Relator to never use the 0007U code for any Genotox tests and to always use the G0483 code instead, for the obvious reason that Genotox would be paid far less under the 0007U code as opposed to the G0483 code.

166.

Since 2018, Genotox has submitted thousands of tests for payment using the G0483 code to federal health care programs.

167.

Each one of those submissions was improperly "up-coded" to the more lucrative G0483 code, instead of using the 0007U code for ToxProtect that Genotox had applied for and been approved by CMS to use.

168.

By doing so, Genotox has submitted or caused the submission of thousands of false claims to federal health care programs for payment which were up-coded in order to make Genotox more money.

169.

Each claim Genotox has submitted to a federal health care program for payment under the G0483 code after receiving CMS approval for its 0007U code constitutes a materially false claim under the FCA.

### *"ToxDirect" Testing Kits Sent Directly to Patients*

170.

Genotox started a program called "ToxDirect" in late 2019.

171.

Genotox COO Shawn Lunney created the ToxDirect program and described it as "[t]esting to augment office based providers to enable Telehealth or remote patient management by having DNA authenticated drug testing from anywhere."

172.

Through ToxDirect, Genotox sends urine drug test kits directly to patients at home, without a doctor's order. Genotox refers to this as a "turnkey" solution for providers.

173.

When the patients send the samples back to Genotox, Genotox then submits claims for these tests as if they were done in-office and pursuant to the doctor's

"custom toxicology profile"/standing order, including to federal health care programs.

174.

Genotox sends its ToxDirect kits to patients it had on file from prior toxicology test orders, and when Genotox received a sample from one of its ToxDirect kits, Genotox used the patient's ICD-10 diagnosis coding from their previous order to enter the required information into Genotox's electronic ordering system, which was necessary in order to submit claims to federal health care programs.

175.

Genotox billed its ToxDirect claims under the G0483 CPT code.

176.

Patients of Defendants Bearden; Premier Medical Group in Clarksville, TN; and Colorado Mountain Medical were sent ToxDirect testing kits by Genotox.

177.

Defendants Genotox and McCarty have submitted claims for these tests to federal health care programs for payment as if they were in-office visits.

178.

Defendant Bearden has caused claims to be submitted for these tests to

federal health care programs for payment as if they were in-office visits.

179.

Medicare only pays for tests that are reasonable and necessary for the

treatment or diagnosis of an individual patient's illness or injury. *See* 42 U.S.C. §

1395y(a)(l)(A).

180.

Under Medicare Part B regulations:

> [a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other
> diagnostic tests must be ordered by the physician who is treating the
> beneficiary, that is, the physician who furnishes a consultation or treats
> a beneficiary for a specific medical problem and who uses the results
> in the management of the beneficiary's specific medical problem. Tests
> not ordered by the physician who is treating the beneficiary are not
> reasonable and necessary.

42 C.F.R. § 410.32(a); *see also* Medicare Claims Processing Manual, Pub. No.

100-04, chapter 16, § 10.

181.

The Medicare Benefit Policy Manual ("MBPM") details CMS's policies for

payment of Medicare benefits.  MBPM's "Requirements for Ordering and

Following Orders for Diagnostic Tests" define an "order" as "a communication

from the treating physician/practitioner requesting that diagnostic test be performed for a beneficiary ... [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MBPM, Ch. 15, § 80.6.1.

182.

The HHS OIG recommends that labs have requisition forms that "promote the conscious ordering of tests by physicians" and "ensure that the physician ... has made an independent medical necessity decision with regard to each test the laboratory will bill." OIG Guidance, 63 Fed. Reg. 45,075, at 45,079.

183.

Genotox's ToxDirect program causes the submission of false claims to federal health care programs because none of the tests submitted were directly ordered by a physician pursuant to a specific diagnosis or for the treatment of a specific disease in these patients.

184.

Rather, these claims were billed and submitted under Genotox's "custom toxicology profiles"/standing orders as if they had been ordered by the physician and the specimens collected in-office.

185.

Because they were not ordered by a physician in order to diagnose and treat a particular illness or injury as evaluated in the physician's office, the ToxDirect tests "are not reasonable and necessary."  42 C.F.R. § 410.32(a).

186.

Claims submitted to federal health care programs for such tests are materially false claims under the FCA.

## COUNT I – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)

## (Kickback Payments to Sales Representatives)

187.

Relator re-alleges and reincorporates paragraphs 1 through 186 as if fully set forth herein.

188.

Genotox's commission payments to its sales representatives who are independent contractors constitute unlawful remuneration and violate the AKS.  42 U.S.C. § 1320a-7b.

189.

Every claim submitted by Defendants Genotox and/or McCarty (or that was caused to be submitted) that was tainted by an AKS violation constitutes a false

claim under the FCA, and the Government would not have paid the claims but for the Defendants' knowing violations of the AKS.  42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(A).

190.

Defendants Genotox and McCarty made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of the AKS. 42 U.S.C. § 1320a-7b(g); 31 U.S.C.A. § 3729(a)(1)(B).

191.

Genotox's commission payments to its sales representatives, including those classified as Genotox employees, that do not fall within the purview of the AKS constitute violations of EKRA.  18 U.S.C. § 220.

192.

Every claim submitted by Defendants Genotox and/or McCarty (or that was caused to be submitted) that was tainted by an EKRA violation constitutes a false claim under the FCA, and the Government would not have paid the claim but for the Defendants' knowing violations of EKRA.  31 U.S.C. § 3729(a)(1)(A).

193.

Defendants Genotox and/or McCarty made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of EKRA. 31 U.S.C. § 3729(a)(1)(B).

194.

Through the above-described conduct, Defendants Genotox and/or McCarty have conspired amongst themselves and with others to present, or cause to be presented, false claims to the United States and agencies thereof in violation of 31 U.S.C. § 3729(a)(1)(C).

195.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, for Genotox urine drug tests were induced by fraud.

196.

The Government, unaware of the falsity of claims caused to be submitted by Defendants Genotox and/or McCarty, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent conduct.

197.

By virtue of the acts described in this Count, Defendants Genotox and

McCarty are liable to the U.S. Government for a civil penalty of not less than

$5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil

Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-

410), plus three times the amount of damages which the Government has sustained

because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## COUNT II – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)
## (Kickback Payments to SPs and Medical Practices in Which SPs Work)

198.

Relator re-alleges and reincorporates paragraphs 1 through 197 as if fully set

forth herein.

199.

Genotox's commission payments to its SPs constitute unlawful remuneration

and violate the AKS.  42 U.S.C. § 1320a-7b.

200.

The work Genotox's SPs perform for medical practices, outside of the

collection and processing of urine specimens for testing by Genotox that they are

allowed to perform, constitutes unlawful remuneration and violates the AKS. 42 U.S.C. § 1320a-7b.

201.

Genotox's rental of unnecessary office space, or rental of office space at greater than fair market value, from medical practices where its SPs work also constitutes prohibited remuneration under the AKS. 42 U.S.C. § 1320a-7b.

202.

Every claim submitted by Defendants Genotox, McCarty, Chicago Pain, Diesfeld, and/or New Beginnings (or that was caused to be submitted) that was tainted by one of these AKS violations constitutes a false claim under the FCA, and the Government would not have paid the claims but for the Defendants' knowing violations of the AKS. 42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(A).

203.

Defendants Genotox, McCarty, Chicago Pain, Diesfeld, and/or New Beginnings made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of the AKS. 42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(B).

204.

Genotox's commission payments to its SPs, including those classified as W-2 employees, that do not fall within the purview of the AKS constitute violations of EKRA.  18 U.S.C. § 220.

205.

The work Genotox's SPs perform for medical practices, outside of the collection and processing of urine specimens for testing by Genotox that they are allowed to perform, and that does not fall within the purview of the AKS constitutes an EKRA violation.  18 U.S.C. § 220.

206.

Genotox's rental of unnecessary office space, or rental of office space at greater than fair market value, from medical practices where its SPs work, and that does not fall within the purview of the AKS, constitutes prohibited remuneration under EKRA.  18 U.S.C. § 220.

207.

Every claim submitted by Defendants Genotox, McCarty, Chicago Pain, Diesfeld, and/or New Beginnings (or that was caused to be submitted) that was tainted by an EKRA violation constitutes a false claim under the FCA, and the

Government would not have paid the claim but for the Defendants' knowing violations of EKRA. 31 U.S.C. § 3729(a)(1)(A).

208.

Defendants Genotox, McCarty, Chicago Pain, Diesfeld, and/or New Beginnings made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of EKRA. 31 U.S.C. § 3729(a)(1)(B).

209.

Through the above-described conduct, Defendants Genotox, McCarty, Chicago Pain, Diesfeld, and/or New Beginnings have conspired amongst themselves and with others to present, or cause to be presented, false claims to the United States and agencies thereof in violation of 31 U.S.C. § 3729(a)(1)(C).

210.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, for Genotox urine drug tests were induced by fraud.

211.

The Government, unaware of the falsity of claims caused to be submitted by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent conduct.

212.

By virtue of the acts described in this Count, Defendants Genotox, McCarty, Chicago Pain, Diesfeld, and/or New Beginnings are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## COUNT III – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)

## (Kickbacks to Medical Practices with whom Genotox has "Hybrid" Billing Arrangements)

213.

Relator re-alleges and reincorporates paragraphs 1 through 212 as if fully set forth herein.

214.

Each claim Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden submitted or caused to be submitted to a federal health care program for payment which originated from a practice with whom Defendant Genotox has a "hybrid" billing arrangement is a false claim under the FCA because it was tainted by an unlawful AKS or EKRA violation.

215.

Defendant Genotox's "hybrid" billing arrangements violate the AKS because the "spread" that Defendants Genotox and/or McCarty allows these practices to keep on commercial claims is unlawful remuneration designed to induce practices to refer all of their toxicology test orders to Defendant Genotox, to include those covered by governmental payors.  42 U.S.C. § 1320a-7b.

216.

Every claim submitted by Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden (or that was caused to be submitted) that was tainted by an AKS violation constitutes a false claim under the FCA, and the Government would not have paid the claims but for the Defendants' knowing violations of the AKS.  42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(A).

217.

Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of the AKS.  42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(B).

218.

The "spread" Defendants Genotox and/or McCarty allow practices to keep pursuant to Defendant Genotox's "hybrid" billing arrangements, to the extent it does not fall within the purview of the AKS, constitutes unlawful remuneration under EKRA.  18 U.S.C. § 220.

219.

Every claim submitted by Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden (or that was caused to be submitted) that was tainted by an EKRA violation constitutes a false claim under the FCA, and the Government would not have paid the claim but for the Defendants' knowing violations of EKRA.  31 U.S.C. § 3729(a)(1)(A).

220.

Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of EKRA. 31 U.S.C. § 3729(a)(1)(B).

221.

Through the above-described conduct, Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden have conspired amongst themselves and with others to present, or cause to be presented, false claims to the United States and agencies thereof in violation of 31 U.S.C. § 3729(a)(1)(C).

222.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, for Genotox urine drug tests were induced by fraud.

223.

The government, unaware of the falsity of claims caused to be submitted by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent conduct.

224.

By virtue of the acts described in this Count, Defendants Genotox, McCarty, Optim Healthcare, and/or Bearden are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## COUNT IV – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)
## (Self-Referrals among Dr. McCarty's Entities)

225.

Relator re-alleges and reincorporates paragraphs 1 through 224 as if fully set forth herein.

226.

Any claims to federal health care programs Defendants McCarty, Genotox, Balcones, and/or Genorite submitted or caused to be submitted that were tainted by Defendants' violations of the Stark Law as described above constitute false claims under the FCA for which Defendants McCarty, Genotox, Balcones, and/or Genorite are liable for treble damages and civil monetary penalties.

227.

Each referral from either Genorite or Balcones to Genotox was a violation of the Stark Law due to Dr. McCarty's or his wife's ownership and/or financial interest in these entities.  42 U.S.C. § 1395nn.

228.

By virtue of Defendants McCarty's, Genotox's, Balcones's, and/or Genorite's violations of 42 U.S.C. § 1395nn, Defendants have knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to federal health care programs. 31 U.S.C. § 3729(a)(1)(A).

229.

By virtue of Defendants McCarty's, Genotox's, Balcones's, and/or Genorite's violations of 42 U.S.C. § 1395nn, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims for payment or approval to federal health care programs.  31 U.S.C. § 3729(a)(1)(B).

230.

By virtue of Defendants McCarty's, Genotox's, Balcones's, and/or Genorite's violations of 42 U.S.C. § 1395nn, Defendants have conspired to violate 31 U.S.C. § 3729(a)(1)(A) and (B).  31 U.S.C. § 3729(a)(1)(C).

231.

By virtue of the acts described in this Count, Defendants McCarty, Genotox, Balcones, and/or Genorite are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## <u>COUNT V – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)</u>

### <u>(The Submission of Claims for Medically Unnecessary and Unreasonable Urine Drug Tests Through the Use of "Custom Toxicology Profiles")</u>

232.

Relator re-alleges and reincorporates paragraphs 1 through 231 as if fully set forth herein.

233.

As described above, Genotox's "custom toxicology profiles"/standing orders caused an excessive submission of claims for toxicology tests, both in overall number of tests as well as in the particular types of tests ordered, to federal health care programs for payment.

234.

Genotox's "custom toxicology profiles"/standing orders caused overbilling of federal health care programs because the excessive number and depth of tests ordered pursuant to these profiles were not reasonable or medically necessary, nor was the need for such tests properly documented as required by law.  42 U.S.C. § 1395y(a)(l )(A); 42 C.F.R. §§ 410.32(a), (d)(2); 410.32(d)(3).

235.

Each and every claim submitted to a federal health care program for payment which was billed under a Genotox "custom toxicology profile"/standing order violated federal law and constitutes a materially false claim under the FCA.

236.

By virtue of Defendants Genotox's, McCarty's, Optim Healthcare's, Bearden's, Chicago Pain's, and/or Diesfeld's violations of federal law through their use of "custom toxicology profiles"/standing orders and claims submitted pursuant to them, Defendants Genotox, McCarty, Optim Healthcare, Bearden, Chicago Pain, and/or Diesfeld have knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to federal health care programs.  31 U.S.C. § 3729(a)(1)(A).

237.

By virtue of Defendants Genotox's, McCarty's, Optim Healthcare's,

Bearden's, Chicago Pain's, and/or Diesfeld's violations of federal law through

their use of "custom toxicology profiles"/standing orders and claims submitted

pursuant to them, Defendants Genotox, McCarty, Optim Healthcare, Bearden,

Chicago Pain, and/or Diesfeld have knowingly made, used, or caused to be made

or used, false records or statements material to false and fraudulent claims for

payment or approval to federal health care programs.  31 U.S.C. § 3729(a)(1)(B).

238.

By virtue of Defendants Genotox's, McCarty's, Optim Healthcare's,

Bearden's, Chicago Pain's, and/or Diesfeld's violations of federal law through

their use of "custom toxicology profiles"/standing orders and claims submitted

pursuant to them, Defendants Genotox, McCarty, Optim Healthcare, Bearden,

Chicago Pain, and/or Diesfeld have conspired amongst themselves and with others

to violate 31 U.S.C. § 3729(a)(1)(A) and (B).  31 U.S.C. § 3729(a)(1)(C).

239.

By virtue of the acts described in this Count, Defendants Genotox, McCarty,

Optim Healthcare, Bearden, Chicago Pain, and/or Diesfeld are liable to the U.S.

Government for a civil penalty of not less than $5,000 and not more than $10,000

per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants. 31 U.S.C. § 3729(a)(1).

## COUNT VI – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)

## (Kickback Payments to Your Health COO Robert Garcia)

240.

Relator re-alleges and reincorporates paragraphs 1 through 239 as if fully set forth herein.

241.

Each claim Defendants Genotox, McCarty, Your Health, and/or Garcia submitted or caused to be submitted to a federal health care program in connection with the unlawful kickback relationship between Defendants Genotox, McCarty, Your Health Lab, and Garcia is a false claim under the FCA.

242.

Defendant Genotox's payments to Defendant Garcia constitutes unlawful remuneration under the AKS. 42 U.S.C. § 1320a-7b.

243.

Every claim submitted by Defendants Genotox, McCarty, Your Health, and/or Garcia (or that was caused to be submitted) that was tainted by an AKS violation constitutes a false claim under the FCA, and the Government would not have paid the claims but for the Defendants' knowing violations of the AKS. 42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(A).

244.

Defendants Genotox, McCarty, Your Health, and/or Garcia made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of the AKS. 42 U.S.C. § 1320a-7b(g); 31 U.S.C. § 3729(a)(1)(B).

245.

Defendant Genotox's payments to Defendant Garcia that do not fall within the purview of the AKS constitute violations of EKRA. 18 U.S.C. § 220.

246.

Every claim submitted by Defendants Genotox, McCarty, Your Health, and/or Garcia (or that was caused to be submitted) that was tainted by an EKRA violation constitutes a false claim under the FCA, and the Government would not

have paid the claim but for the Defendants' knowing violations of EKRA. 31 U.S.C. § 3729(a)(1)(A).

247.

Defendants Genotox, McCarty, Your Health, and/or Garcia made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program as a result of the Defendants' violations of EKRA. 31 U.S.C. § 3729(a)(1)(B).

248.

Through the above-described conduct, Defendants Genotox, McCarty, Your Health, and/or Garcia have conspired amongst themselves and with others to present, or cause to be presented, false claims to the United States and agencies thereof in violation of 31 U.S.C. § 3729(a)(1)(C).

249.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, for Genotox urine drug tests were induced by fraud.

.

250.

The government, unaware of the falsity of claims caused to be submitted by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent conduct.

251.

By virtue of the acts described in this Count, Defendants Genotox, McCarty, Your Health, and/or Garcia are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## COUNT VII – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)

### (Up-Coding of Genotox Tests)

252.

Relator re-alleges and reincorporates paragraphs 1 through 251 as if fully set forth herein.

253.

Each claim Defendants Genotox and/or McCarty submitted to a federal health care program for payment under the G0483 code after receiving CMS approval for Genotox's 0007U code constitutes a materially false claim under the FCA.

254.

Defendants Genotox and/or McCarty up-coded thousands of tests for reimbursement using the G0483 code rather than using the 0007U code in order to maximize Genotox's payment from federal health care programs.

255.

By doing so, Defendants Genotox and/or McCarty submitted or caused the submission of thousands of false claims to federal health care programs for payment which were up-coded in order to make Genotox more money.

256.

Each claim Defendants Genotox and/or McCarty submitted or caused to be submitted to a federal health care program for payment under the G0483 code after receiving CMS approval for its 0007U code constitutes a false claim under the FCA, and the Government would not have paid the claim but for the Defendants' conduct.  31 U.S.C. § 3729(a)(1)(A).

257.

Defendants Genotox and/or McCarty made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to a federal health care program each time Defendants Genotox and/or McCarty submitted or caused to be submitted to a federal health care program a claim for payment under the G0483 code after receiving CMS approval for its 0007U code. 31 U.S.C. § 3729(a)(1)(B).

258.

Through the above-described conduct, Defendants Genotox and/or McCarty have conspired amongst themselves and with others to present, or cause to be presented, false claims to the United States and agencies thereof in violation of 31 U.S.C. § 3729(a)(1)(C).

259.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, for Genotox urine drug tests were induced by fraud.

260.

The government, unaware of the falsity of claims caused to be submitted by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent conduct.

261.

By virtue of the acts described in this Count, Defendants Genotox and/or McCarty are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## COUNT VIII – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) & (C)

## ("ToxDirect" Testing Kits Sent Directly to Patients)

262.

Relator re-alleges and reincorporates paragraphs 1 through 261 as if fully set forth herein.

263.

Defendants Genotox's, McCarty's, and/or Bearden's submission of claims to federal health care programs for tests conducted through Genotox's ToxDirect

.

program constitute false claims under the FCA because none of the tests submitted

were directly ordered by a physician pursuant to a specific diagnosis or for the

treatment of a specific disease in these patients and, therefore, violate federal law.

264.

Each claim Defendants Genotox, McCarty, and/or Bearden submitted or

caused to be submitted to a federal health care program through Genotox's

ToxDirect program constitutes a false claim under the FCA, and the Government

would not have paid the claim but for the Defendants' conduct.  31 U.S.C. §

3729(a)(1)(A).

265.

Defendants Genotox, McCarty, and/or Bearden made or used, or caused to

be made or used, false records or statements material to false or fraudulent claims

submitted to a federal health care program each time Defendants Genotox,

McCarty, and/or Bearden submitted or caused to be submitted to a federal health

care program a claim through Genotox's ToxDirect program.  31 U.S.C. §

3729(a)(1)(B).

266.

Through the above-described conduct, Defendants Genotox, McCarty,

and/or Bearden have conspired amongst themselves and with others to present, or

cause to be presented, false claims to the United States and agencies thereof in violation of 31 U.S.C. § 3729(a)(1)(C).

267.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, for Genotox urine drug tests were induced by fraud.

268.

The government, unaware of the falsity of claims caused to be submitted by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent conduct.

269.

By virtue of the acts described in this Count, Defendants Genotox, McCarty, and/or Bearden are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more than $10,000 per claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government has sustained because of the acts of Defendants.  31 U.S.C. § 3729(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This request includes three times the amount of damages to the United States plus civil penalties of no more than $11,000 and no less than $5,500 for each violation before or on November 2, 2015; civil penalties of no more than $22,363 and no less than $11,181 for each violation after November 2, 2015; and any other recoveries or relief provided for under the FCA.

Further, Relator requests that he receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR TRIAL BY JURY

Plaintiff/Relator ALEX DIGIACOMO, on behalf of himself and the United States, by and through his counsel, hereby demands a jury trial in the above-captioned matter.

Respectfully submitted this 11th day of September, 2020.

BUTLER WOOTEN & PEAK LLP


BY:   /s/Robert H. Snyder, Jr.
      ROBERT H. SNYDER, JR.
         Rob@butlerwooten.com
         Georgia Bar No. 404522
      JOSEPH M. COLWELL (*admission pending*)
         Joseph@butlerwooten.com
         Georgia Bar No. 531527

      2719 Buford Hwy. NE
      Atlanta, GA  30324
      Phone:  (706) 322-1990
      Fax:  (706) 323-2962